# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **THADDEUS J. NORTH** | ) |
| 529 Candlewood Lake Road | ) |
| Brookfield, CT 06804 | ) |
| | ) |
| **and** | ) |
| | ) |
| **MARK P. POMPEO** | ) |
| 129 Park Avenue | ) |
| Weymouth, MA 02190 | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | )   **Civil No.** |
| | ) |
| **SMARSH, INC.** | ) |
| 851 SW 6TH Avenue, Suite 800 | ) |
| Portland, OR 97204 | ) |
| | ) |
| **and** | ) |
| | ) |
| **FINANCIAL INDUSTRY** | ) |
| **REGULATORY AUTHORITY,** | ) |
| **DEPARTMENT OF ENFORCEMENT** | ) |
| 1735 K. Street, NW | ) |
| Washington, DC 20006 | ) |
| | ) |
| **Defendants.** | ) |
| ————————————————— | ) |

## COMPLAINT

Plaintiffs, Thaddeus J. North ("Mr. North") and Mark P. Pompeo ("Mr. Pompeo"), by

counsel, hereby set forth their Complaint for relief against Defendants, Smarsh, Inc. ("Smarsh")

and the Financial Industry Regulatory Authority ("FINRA"), Department of Enforcement

("Enforcement") for spoliation, tampering and destruction of evidence and to prevent use of such spoliated and tampered evidence in federal proceedings, as follows:

## JURISDICTION

1.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331; resolution of the underlying claims herein involves application of the Securities and Exchange Act 1934 as amended, 15 U.S.C. § 78a, *et seq*. ("Exchange Act"). This Court has jurisdiction to grant injunctive relief pursuant to 28 U.S.C. Fed.R.Civ.P. Rule 65.

2.      This Court has supplemental jurisdiction over any state law claims raised herein pursuant to 28 U.S.C. § 1367.

## PARTIES

3.      Plaintiff North is an individual whose residence and business addresses are in Connecticut; he was registered as the Chief Compliance Officer  ("CCO") with Southridge Investment Group, LLC ("Southridge") from February 2008 to August 2011 and subsequently registered with Ocean Cross Capital Markets, LLC ("Ocean Cross") from August 2011 to January 2013. Mr. North and approximately half of the registered representatives from Southridge became registered with Ocean Cross when Southridge came under investigation by FINRA and other regulators who were investigating a hedge fund managed by the owner of Southridge and an alleged tip about a business relationship between LK,[1] who was registered with Southridge and TC,[2] a statutorily disqualified person. Mr. North is a respondent in FINRA Enforcement Disciplinary Proceeding No. 2010025087302 involving Southridge ("Southridge Proceeding") and Disciplinary Proceeding No. 2012030527503 involving Ocean Cross ("Ocean Cross Proceeding"). In both Disciplinary Proceedings Mr. North was accused of failing to review

---

[1] *See* attached Appendix of Acronyms / Initials describing non-parties.
[2] *Id.*

2

sufficient electronic correspondence; in the Southridge matter he was also accused of not detecting and reporting the business relationship between LK and TC.

4.     Plaintiff Pompeo is an individual who resides in Massachusetts. Mr. Pompeo was registered as a securities broker with Southridge from January 2010 to September 2011 and subsequently registered with Ocean Cross from September 2011 to September 2012; his business for the firm involved sales and marketing. He was charged with FINRA rule violations in an August 16, 2013 pursuant to FINRA Examination No. 20120305375.[3]

5.     Defendant Smarsh is a corporation whose principal business address and headquarters are in Portland, Oregon. Smarsh professes to serving "over 20,000 customers" and to being "the leading provider of archiving & compliance solutions for companies in regulated and litigious industries." *See e.g.* http://www.smarsh.com/about-us. Smarsh contracted with Southridge in or about 2007 and with Ocean Cross in August 2011 to preserve exact and unchangeable copies of internal and external electronic communications for all registered representatives of the two (2) firms for compliance at all times from July 1, 2009 through July 1, 2013 (the "Relevant Period") and according to the requirements of the Exchange Act.

6.     Defendant FINRA is a private not-for-profit corporation self-regulatory organization ("SRO"). It was formed in Delaware on September 3, 1936 as the Investment Bankers Conference Inc., was renamed the National Association of Securities Dealers, Inc. in or about 1939, and was renamed FINRA in a restated Certificate of Incorporation on July 30, 2007. FINRA's business headquarters are located in Washington, DC. FINRA is registered with the Securities and Exchange Commission ("SEC") as a national securities association pursuant Section 15A of the Exchange Act, 15 U.S.C. § 78*o*-3. *Nat'l Ass'n of Sec. Dealers, Inc. v. SEC,*

---

[3] Mr. Pompeo settled the allegations with FINRA after an on the record interview in which he was shown emails he could not explain, which emails are now known to have been spoliated.

431 F.3d 803, 804 (D.C.Cir. 2005). "By virtue of its statutory authority, [FINRA] wears two institutional hats: it serves as a professional association, promoting the interests of its members, and it serves as a quasi-governmental agency, with express statutory authority to adjudicate actions against members who are accused of illegal securities practices and to sanction members found to have violated the Exchange Act or ... [SEC] regulations issued pursuant thereto." *Id.* (internal citations omitted); 15 U.S.C. § 78*o*-3(b)(7). "Disciplinary actions brought by [FINRA's] Department of Enforcement may be adjudicated before a [FINRA] Hearing Panel … and appealed to the [FINRA] National Adjudicatory Council…." *See Nat'l Ass'n of Sec. Dealers,* 431 F.3d at 804."[FINRA] must notify the SEC of any final disciplinary action taken against a member." *Id.*; 15 U.S.C. § 78s(d)(1). "A statutory system authorizing self-regulatory organizations to act as quasi-governmental agencies in disciplining members for federal securities law violations has existed for almost 70 years." *See Nat'l Ass'n of Sec. Dealers,* 431 F.3d at 804.

      7.     Non-party William E. Schloth ("Schloth") was the Chief Executive Officer ("CEO"), and General Securities and Financial Operations Principal at both Southridge and Ocean Cross at all times during the Relevant Period. In July 2009 CEO Schloth hired non-party LK; he was LK's direct supervisor at both Southridge and Ocean Cross firms. Mr. Schloth had interviewed and determined not to hire TC in June 2009 due to the cost and regulatory procedures that would have been necessary if TC were hired by the Southridge firm. Mr. Schloth discussed TC's status with FINRA's manager of Statutory Disqualification Regulatory Operations in August 2009.

8.      Non-party LK is a person who was targeted by FINRA for investigation after Southridge CEO Schloth promptly informed FINRA in August 2009 about a business relationship between LK and non-party TC, a statutorily disqualified person.

## FACTS

9.      NASD Rule 3010(a) – (d) and 17 CFR 240.17a-4(f)(2)(ii)(A) impose legal duties on broker-dealers to have written supervisory procedures that include preserving written and electronic communications, and specifically that copies of all electronic communications be preserved "exclusively in a non-rewriteable, non-erasable format." Said electronically stored information ("ESI") includes emails, chats, instant messages, and like messaging without regard to whether the delivery platform is a personal computer ("PC"), laptop, Smart phone or iPhone, tablet or iPad, Blackberry or other such handheld device.

10.      "In 1998, recognizing that the growing use of electronic communications such as email made adherence to this requirement difficult, FINRA amended its rules to allow members the flexibility to design supervisory review procedures for correspondence with the public that are appropriate to the individual member's business model." FINRA Regulatory Notice 07-59 ("Reg. Not. 07-59")(December 2007).

11.      SEC regulation 17 CFR 240.17a-4(f)(2)(ii)(A) requires firms and brokers registered with firms to preserve unalterable, non-rewriteable, and non-erasable copies of electronic communications, because the electronic record of an email is the original and official federal record according to *Armstrong v. Executive Office of the President, Office of Admin.*, 1 F.3d 1274 (D.C.Cir. 1993).

12.      Registered securities firms are not limited to a particular technology in preserving electronic communications in compliance with the rules; however, any electronic storage

systems vulnerable to the "ability to overwrite or erase records stored on these systems makes them non-compliant with Rule 17a-4(f)." *See e.g.* SEC Release No. 34-47806 effective May 12, 2003.

13.     Regulatory notices published by SEC and FINRA provide interpretive guidance to firms for implementing measures consistent with the regulatory supervision rules: SEC Release No. 34-47806 provides that Broker-dealers are allowed to preserve records on 'electronic storage media'," which Rule 17a-4 defines as "any digital storage medium or system" and "does not require that a particular type of technology or method be used to achieve the non-rewriteable and non-erasable requirement in paragraph (f)(2)(ii)(A)"; and FINRA Reg. Not. 07-59 provides that although content and audience are concerns underlying the duty of firms to supervise electronic communications, there is no requirement to review every communication, and that "[e]vidence of review can be satisfied by use of a log or other record from the electronic communications system that identifies the reviewers."

14.     FINRA does not require that broker-dealers use specified systems or companies to satisfy SEC and FINRA rule requirements for the storage and review of electronic communications; Southridge and Ocean Cross complied with their regulatory duty of preserving electronic communications by contracting with Smarsh to (a) use proper care to preserve by commercially responsible methods exact, unalterable, non-rewriteable, and non-erasable copies of each firm's registered representatives' domain emails, Bloomberg messages and other electronic correspondence in a permanent file for the Relevant Period, (b) provide access to that database of ESI for compliance review, and (c) maintain an accurate electronic record that documents ESI compliance reviews.  *See supra* para. 5.

15.     SEC and FINRA recognize that it is an industry practice for firms to contract with vendors of electronic storage systems, like Smarsh, for preserving electronic communications as required by 17 CFR 240.17a-4(f)(2)(ii)(A), to provide the interrelated platforms for reviewing the databases containing the electronic communications as required by the NASD and FINRA supervisory rules, and to maintain electronic copies of the relevant compliance activities as required by SEC, FINRA and NASD record keeping and supervisory rules.

16.     "FINRA recognizes that, as appropriate evidence of review [of electronic communications], email related to members' investment banking or securities business may be reviewed electronically and the evidence of the review may be recorded electronically (citation omitted)." Reg. Not. 07-59 note 8.

17.     Throughout the Relevant Period the Southridge and Ocean Cross firms had written supervisory procedures that provided guidance for persons with supervisory responsibilities and that addressed email archiving and review.

18.     At all times between July 2009 and September 2011, although Smarsh performed electronic correspondence preservation and provided the search platform for electronic correspondence, Southridge Technologies LLC,[4] a Connecticut company, controlled, operated and maintained the computers, programs, security, and the network server across which all internal and external email communications for the Southridge.com domain emails passed prior to delivery to the individual mailboxes for all persons registered with Southridge.

19.     Mr. Schloth arranged for the contract between Web.com and Ocean Cross to host the Ocean Cross website and the *email* server and service for the OCCAPM.com domain emails from August 2011 until July 2013.

---

[4] Southridge Technologies LLC is not related to Southridge Investment Group, LLC except for providing technology services to Southridge until withdrew its registration with FINRA in 2011.

20.     The Ocean Cross firm remained in the same office location as Southridge and registered many of the Southridge representatives when it was approved by FINRA to commence business. Ocean Cross also used the same local area network ("LAN") server as was used by Southridge and, therefore, internal and external email for Ocean Cross employees and registered representatives passed across the same network server for delivery to recipient email boxes of persons connected to the LAN.

21.     Smarsh handled the Ocean Cross domain set-up and provided instructions to registered representatives for the transition from Southridge to Ocean Cross for setting up their various electronic and handheld devices with specific IP addresses that enabled Smarsh to preserve all internal and external firm and Bloomberg domain electronic communications.

22.     Even though Bloomberg, LP maintains a permanent archive or "vault", for its customers' messaging, e.g. email communications and "chats", additional set-up time and protocols were necessary to have Smarsh preserve copies of registered representatives' Bloomberg communications at both Southridge and Ocean Cross. Bloomberg required Smarsh to obtain written authorization from LK, a user ID and password to allow daily file transfer protocol ("FTP") for Bloomberg email and instant messaging to Smarsh from a site separate from Bloomberg's communication system.

23.     In addition to preserving the ESI, Smarsh had a duty to place the ESI, from both the firm domain email systems and Bloomberg in an accessible, searchable database to which Mr. North and others with supervisory and compliance responsibilities would have access in order to satisfy and perform the duty of reviewing internal and external electronic communications.

24.     Mr. North reasonably relied on Smarsh's promises in the Smarsh contract for services, its industry reputation and public and other representations that email was being properly preserved, that Smarsh had the degree of skill necessary and utilized proper procedures to preserve internal and external electronic communications for the Southridge and Ocean Cross firms' registered representatives in an unalterable, non-rewriteable and non-erasable format in satisfaction of regulatory record-keeping rules and compliance requirements for electronic communications review as required by the Exchange Act.

25.     The contracts between Smarsh and Southridge and between Smarsh and Ocean Cross set forth Smarsh's express duties to the firms and the firms' registered representatives to preserve copies of all electronic communications according to SEC and FINRA rules.

26.     In his role as CCO for the two (2) firms, Mr. North relied upon communications with various Smarsh representatives and teams regarding implementation of electronic communications preservation protocols throughout the Relevant Period.

27.     Mr. Pompeo, who was not connected to the local area network while registered with either Southridge or Ocean Cross, reasonably relied on Smarsh to provide proper instruction and then to preserve copies of his electronic communications in an unalterable, non-rewriteable and non-erasable format to satisfy regulatory record-keeping requirements set forth by the SEC and FINRA.

28.     By the nature of its business Smarsh knew or should have known that firms like Southridge and Ocean Cross and individuals like the plaintiffs (a) would and did in fact reasonably rely upon Smarsh's knowledge, expertise and representations respecting its archival and compliance solutions, and (b) would and did reasonably believe that Smarsh would exercise due and proper care in preserving their own and the firms' internal and external electronic

communications in a commercially reasonable manner in an accessible and properly searchable database.

29.     Mr. North joined Southridge in February 2008 as a successor CCO at Southridge; thereafter on March 13, 2008, Smarsh confirmed in an email that "[h]ierarchy permissions have been turned on". By the nature of its business and interaction with Mr. North, Smarsh knew or should have known that as the Southridge CCO Mr. North had a duty to review firm domain and Bloomberg email and or ensure that others with supervisory responsibility fulfilled those duties; Mr. North therefore depended upon Smarsh to deliver its archival and compliance solutions to the Southridge firm with due and proper care and without neglect or other malfeasance.

30.     Likewise, when Ocean Cross was approved by FINRA to conduct business and Ocean Cross contracted with Smarsh to archive email on or about August 1, 2011, Smarsh knew or should have known that the firm's duties and responsibilities to archive and review electronic communications would likewise be the same or similar as those at Southridge.

31.     By the nature of its business and consistent with the contracts with the Southridge and Ocean Cross firms, Smarsh knew or should have known that its preservation of the electronic communications was intended to satisfy the firms' and individual registered representatives' compliance with the statutory duty to preserve a permanent, unalterable, non-rewriteable and non-erasable record of firm electronic communications.

32.     By the nature of its business Smarsh also knew or should have known that the databases of ESI it preserved and purported to be Southridge and Ocean Cross email were intended to be and are the primary database or source of ESI for compliance review of electronic correspondence undertaken by Mr. North and others with supervisory responsibility at the firms.

33.     By the nature of its business Smarsh knew or should have known that Smarsh's record(s) of electronic correspondence review would be relied upon by the firms and by individuals with compliance duties to demonstrate compliance in reviewing electronic communications, and that such records would likely be used in federal proceedings to determine whether firms and persons with supervisory responsibilities fulfilled their duties according to SEC and FINRA rules.

34.     In the course of FINRA examination(s) and various 8210 letter requests for information that began in 2010, the Southridge and Ocean Cross firms arranged for Smarsh to deliver the firms' electronic communications records directly to FINRA, because the 8210 letters demanded delivery of electronic communications in "a special format", e.g. .pst. CEO Schloth stated under oath before Enforcement attorneys and investigators, "… when you guys request something, we just don't want to screw it up in terms of download. So we just ask SMARSH [sic] to do it. That's generally what - - the best way to do it." Excerpts from Schloth On the Record Interview ("OTR") (In the Matter of Southridge) dated February 9, 2012 p. 89, ll. 2-9, marked Exhibit 1. As a result, Smarsh delivered Southridge and Ocean Cross ESI directly to Enforcement according to FINRA Rule 8210 requests throughout the Relevant Period.

35.     In July and August 2013 Enforcement initiated the above-noted disciplinary proceedings against Mr. North.[5]

36.     After Smarsh delivered the Southridge and Ocean Cross ESI for the Relevant Period to FINRA, Enforcement in the Boston FINRA Office accused Mr. Pompeo of violations of FINRA Rule 2010 and NASD Rule 2210 (d) alleging that he sent information about

---

[5] For no apparent reason, in the Southridge Proceeding Mr. North is accused of failing to report LK's association with a statutorily disqualified person, even though CEO Schloth communicated the relationship directly to the manager of FINRA's Statutory Disqualification Program in Member Regulation shortly after LK was registered with the Southridge firm in 2009.

investments offered by the firm by way of email communication(s) with the public, which information, although not prepared and could not be verified by Mr. Pompeo, was deemed to violate SEC rules.

37.     Beginning in November 2013 Enforcement delivered CDs/DVDs to Mr. North containing ESI alleged to be exact copies of the database of emails received directly from Smarsh and upon which it based its disciplinary actions against Mr. North and Mr. Pompeo.

38.     The CDs/DVDs contained predominantly electronic communications for many if not all firm members, scans of documents obtained from the firms, and copies of OTR interviews in the Southridge and Ocean Cross Proceedings conducted by Enforcement of Messrs. North and Schloth in April 2012 and LK in September 2011 and August 2012 in the Disciplinary Proceedings. Mr. North and LK had not retained counsel to attend their respective OTRs.

39.      During the OTRs the witnesses were shown exhibits purporting to be printed copies of email communications, which exhibits created unexplainable confusion in the witnesses: Mr. North did not remember seeing or reviewing any of the emails represented in the exhibits shown to him in OTRs; and while being shown a series of emails in one OTR, LK remarked, " - - you know this is deceiving. This isn't true." *See* Excerpts from LK OTR (In the Matter of Southridge) dated September 13, 2011 p. 183, ll. 3-4, marked Exhibit 2.

40.     In February 2014 undersigned counsel expressed concerns to FINRA Enforcement and the Office of Hearing Officers about disc access problems in a motion to compel disclosure of information, documents, and files believed withheld; due to problems accessing the CDs/DVDs delivered by Enforcement and visible indicia of spoliation to the ESI

produced in the Southridge Proceeding against Mr. North,[6] a computer technician was retained in March 2014 to assist in organizing and analyzing the ESI received from Enforcement.

41.     In April 2014, LK purchased access to her entire Bloomberg vault for the Relevant Period, which a computer technologist downloaded from a secure FTP website managed by Bloomberg, for the purpose of comparing the contents of the Bloomberg vault to the ESI allegedly preserved by Smarsh and purporting to be Bloomberg messages and to determine why the ESI appeared to be spoliated and, if possible, to determine the circumstances under which such spoliation occurred.

42.     LK's Bloomberg vault contained over two hundred twelve thousand (212,000) emails and a few thousand chats of various types in extensible markup language ("XML") for the Relevant Period.

43.     The electronically stored records initially produced by Smarsh in the Southridge Proceeding and delivered by Enforcement in late 2013 contained less than sixty thousand (60,000) records in .pst format, allegedly emails attributable to LK *and* her sister-assistant; the email records for LK and produced by Smarsh in the Ocean Cross Proceeding contained fewer records purporting to be LK's emails than LK's Bloomberg records for the comparable period of time.

44.     The spoliation observed by the computer technician retained in March 2014 included tens of thousands of emails with language added to sender line descriptions, the substitution or insertion of inaccurate sender and recipient names, formatting and time differences, lost and incomplete content, and multiple copies of the same communication in different formats; further, because Mr. North was familiar with the large number of email communications for the Southridge and Ocean Cross firms, it appeared that tens of thousands of

---

[6] LK was also a co-respondent in the Southridge Proceeding.

electronic communications that should have been preserved by Smarsh had been lost, destroyed, or withheld.

45.     On or about July 22, 2014, in a conference call with Regional Counsel for Enforcement for the Southridge and Ocean Cross Proceedings undersigned counsel again reiterated concern about spoliation of the ESI.

46.     In a Declaration dated July 30, 2014, Dustin Sachs, Managing Consultant with Navigant Legal Technology Solutions, confirmed the findings of the computer technician that certain CDs/DVDs delivered by Enforcement contained permanent read errors and certain anomalies, formatting and content differences existed in the data produced by Smarsh that were not present in the original source emails from the Bloomberg accounts of LK and TC.

47.     On August 8, 2014, a copy of LK's Bloomberg vault obtained by secure FTP download in April 2014 and containing over two hundred twelve thousand (212,000) Bloomberg message XMLs and a few thousand "chat" XMLs were delivered to Enforcement counsel in the Southridge matter.

48.     On or about August 19, 2014, Smarsh representative James "Jimmy" Douglas, as Director of Alliances & Industry Relations for Smarsh, authored a letter to Enforcement purporting to validate Smarsh's archival services and attesting to the reliability of the services Smarsh provided to the Ocean Cross firm.

49.     In a pertinent part the August 19, 2014 letter from Mr. Douglas states:

Smarsh provided Ocean Cross with *email hosting, which integrated with our email archiving platform*. Email was captured *using the journaling function*. Journaling ensures that all emails and attachments sent to, from or within a clients' domain are instantly placed in the archive. There is no window of opportunity for messages to be tampered with before they are sent to the archive.

For Bloomberg archiving, *our solution interfaces with Bloomberg servers directly throughout each day*, capturing any new messages, blogs, or chats that have been sent or

received by the users at a firm. Messages are fully indexed and are stored in their respective XML formats with all attachments and metadata completely preserved.
…
All searches performed, including criteria used, are recorded. Reports can be generated to show those searches performed. (Emphasis added.)

*See* Smarsh Representative Letter dated August 19, 2014, marked Exhibit 3.

50.     On or about October 15, 2014 Enforcement in the Southridge Proceeding delivered two (2) CDs/DVDs of files to Mr. North with a letter from Enforcement counsel Sarah Belter stating: "…in the course of our investigation of the Respondents' allegations of spoliation, we learned that Smarsh, Inc. only provided FINRA Respondent [LK's] Bloomberg emails, not her Bloomberg instant messages."

51.     On November 5 and 25, 2014, Enforcement tendered the testimony of Mr. Douglas to support the August 19, 2014 letter regarding email hosting[7] and Smarsh support to Ocean Cross.

52.     When questioned under oath on November 5, 2014, Mr. Douglas testified that Smarsh hosted the email service and server for Ocean Cross:

[MS. MILLER]     In the first page of your [August 19, 2014] letter which is Exhibit CX-13 you stated that Smarsh hosted Ocean Cross email between September 14, 2011 and July 2013; is that correct?

A.     Yes.
…
Q.     And is that hosted server located in Portland?

A.     I don't know the location of the server where their email was hosted.
…
Q.     To your knowledge, does Smarsh provide the actual server for the emails that you [Smarsh] were hosting?

A.     I don't know for certain.
…

_____

[7] The terms hosting, journaling, capturing and archiving are terms of art specific to certain operations pertaining to the transportation and preservation of email communications.

Q:      Was Smarsh actually hosting Ocean Cross e-mail on a server provided by Smarsh? Your letter states that you were hosting e-mails - -

THE HEARING OFFICER:   Let him answer, please, Ms. Miller.

A.      Yes we were.

Q.      - - on an e-mail server provided by Smarsh?

A.      Yes.

See Excerpts from Hear'g Trans. (In the Matter of Ocean Cross) p. 66, l. 16 – 21; p. 67, l. 3-6; p. 69, l. 3-6; p. 71, l. 10-19  (November 5, 2014), marked Exhibit 4.

53.      Enforcement Counsel who offered Mr. Douglas as a witness had prior knowledge that Web.com not Smarsh hosted the email server and the email services for Ocean Cross having conducted an OTR interview of Mr. Schloth in 2012 during which the following testimony was recorded:

[MR. TABERNER]    Okay. What email address do you currently use?

A.      WSchloth, S C H L O T H, @occapm.com

Q.      Where is it hosted?

A.      Hosted with Web.com.

See Excerpts from Schloth OTR (In the Matter of Ocean Cross) p. 19, ll. 20-23 dated April 23, 2012, marked Exhibit 5.  See also Web.com Account Summary, marked Exhibit 6.

54.      When questioned under oath for an explanation about exhibits purporting to be emails sent between a Bloomberg user who was not an employee of Southridge or Ocean Cross and LK, which made it appear that LK was using an unauthorized Gmail address that could not have transported over the Bloomberg network, Mr. Douglas could offer no explanation, to wit:

Q.      If Mr. – if [A_ H_] is not and was not employed by Ocean Cross, and Smarsh was not capturing Gmail emails of [L_K_], how could Smarsh capture this email?

16

THE HEARING OFFICER:  Mr. Douglas, do you – do you have an answer for that, how Smarsh could have captured this email?

A.      No. I'd have to research it.

*See* Excerpt from Hear'g Trans. (In the Matter of Ocean Cross) p. 38, l. 2 to p. 39, l. 20 (November 25, 2014), marked Exhibit 7.

55.      In February and March 2015, Berryhill Computer Forensics, Inc. ("Berryhill") examined the data allegedly preserved by Smarsh and ultimately delivered by FINRA to the parties in the disciplinary proceedings against Messrs. North and Pompeo; Berryhill determined the following:

> My conclusion, based on the evidence I have examined to date, is that FINRA has been massively misled by Smarsh. The data produced by Smarsh has been altered and manipulated to the point of being nearly unrecognizable when compared to the original source data. Among the many problems I have observed are date and time stamps that have been altered, sender and recipient header information changed, and body content altered or deleted. Overall, these give a misleading and false impression of the facts in this case. The errors and other problems I have highlighted in this report are not occasional occurrences found in only a few messages. They are examples among hundreds of thousands of systematic and widespread failures in how Smarsh has collected, processed and produced the data for which they are supposed to be a neutral third party repository.

*See* Declaration of Jon Berryhill dated March 2, 2015 ¶ 5, marked Exhibit 8.

56.      Berryhill further concluded:

> The scope of spoliation of the emails is so broad that no information produced through Smarsh can be deemed reliable. This would include not only the header information and content of any message or groups of messages, *but also any reports or summaries derived from or referencing those messages. The multiple and repeated failures of Smarsh's processes leave me with no confidence in anything they produce.* (Emphasis added.)

*Id*. ¶ 24.

57.      Regarding the CDs/DVDs produced on October 15, 2014, Berryhill continued:

The flawed processing by Smarsh has led to even the most fundamental of errors in identifying evidence data types. Ms. Miller provided to me two DVDs identified as FINRA production no. 2010025087302, discs 1 and 2. These two discs contain more than 9GB of data saved in PST format in 8 separate files. It was represented to me that FINRA was told by Smarsh that these two discs, produced by Smarsh, contained some 190,000 instant messages recovered from the Bloomberg archives, but that had some how been previously "overlooked."

…

This XLM data appears to be in the same format, with the same XML tags as all the other Bloomberg messages. I see nothing to indicate they are in any way "instant messages." All of the messages I have observed from these two DVDs are consistent in format …. I do note that in this case, as with all the other instances of Bloomberg XML data being converted to PST format, that a substantial amount of information has been added that gives a false and misleading impression of the nature and form of these messages. In Smarsh's processing, produced on the PSTs, they have added to the beginning of each (approximately 190,000) message body the text "BB Message". This text does not appear in the originals.

*Id.* ¶¶ 20-21.

58.     All CDs/DVDs delivered by Smarsh to Enforcement that purport to contain Bloomberg email message files contain files in non-native .eml, .pst, .pdf, and .msg formats in addition to some messages in native Bloomberg XML format.

59.     Because the native format for Bloomberg messaging is XML, the presence of non-native formats on the CDs/DVDs delivered in November 2013 and on October 15, 2014 demonstrates that the Bloomberg messages were intentionally and willfully converted from their native to non-native formats, which would and should not have been possible if Smarsh had properly preserved the messages as unalterable, non-rewriteable, and non-erasable Bloomberg records.

60.      In both the Southridge and Ocean Cross matters, Enforcement claims that spoliation is irrelevant as to the content of the emails and whether or not sufficient email review was conducted; therefore, at no time since bringing concerns about spoliation to the attention of Enforcement in February 2014 and again in July 2014, have either Smarsh or FINRA

investigated the claims and explained how and why multiple non-native format versions of email files exist in the records delivered by Smarsh or the spoliation evident in the form of added language, altered time and date formats, lost and incomplete content, and the absence of more than half of the data that should have been preserved by Smarsh in an unalterable, non-rewriteable, and non-erasable format.

61. At no time has Smarsh or Enforcement provided any verifiable data compilations, reports or summaries or any of the underlying event or other like electronic logs used to prepare any reports of compliance review undertaken at the Southridge and Ocean Cross firms during the Relevant Period.

62. Messrs. North and Pompeo assert that Enforcement's use of evidence spoliated due to Smarsh's failure to properly journal and or archive email it had a duty to each of them to preserve caused Enforcement to bring ill-conceived and unfounded disciplinary proceedings against each of them.

63. Mr. North contends that Smarsh's failure to use even ordinary care in preserving ESI and to provide a reliable archiving and compliance solution platform for performing and recording compliance email review led to unfounded charges against him respecting email review.

64. Messrs. North and Pompeo each incurred legal fees in responding to the disciplinary proceedings against them and incurred costs necessary to examine and analyze the ESI preserved and produced by Smarsh to FINRA.

65. Messrs. North and Pompeo contend they were wrongfully subject to disciplinary actions based on spoliated evidence, and so each was required to report said actions on their

official public record and thereby have suffered retribution in and or loss of gainful employment and professional reputation.

66.     Mr. North was earning one hundred twenty thousand dollars ($120,000) per year as CCO for Southridge prior to the disciplinary actions being brought and sixty thousand dollars ($60,000) per year while registered with Ocean Cross; he currently earns twenty-eight thousand dollars ($28,000) as a CCO, having been able to obtain only part-time employment since reporting the disciplinary proceedings on his public record.

67.     Prior to the disciplinary actions being brought, Mr. Pompeo was earning an average of seventy-five thousand dollars ($75,000) per year; he is currently unemployed since reporting the disciplinary proceedings on his public record.

## COUNT I –SPOLIATION OF ELECTRONICALLY STORED INFORMATION BY SMARSH
### (Intentional Spoliation)

68.     Messrs. North and Pompeo incorporate by reference the allegations contained in paragraphs 1 through 67.

69.      Messrs. North and Pompeo assert that Smarsh committed the tort of intentional spoliation, and specifically, that Smarsh violated its legal duty to each by willful and intentional failure to exercise ordinary care to preserve internal and external email communications, and that Smarsh's breach of duty and malfeasance in preserving the internal and external electronic communications for the firms where each was registered during the Relevant Period caused foreseeable harm to each.

70.     The tort of spoliation is recognized in the District of Columbia and several states where Smarsh provides services to FINRA member firms and individuals; its origin traces back

to the early 1970s. *Holmes v. Amerex Rent-A-Car*, 710 A.2d 846, 848 (D.C. 1998); *Foster v. Lawrence Memorial Hospital*, 809 F.Supp. 831 (D. Kan. 1992).

71. "Spoliation of evidence is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or future litigation." *Lewis v. J.C. Penney*, 12 F.Supp.2d 1083, 1086 (E.D. Cal. 1998) (internal citations omitted).

72. "Both negligent and intentional spoliation require the loss or destruction of physical evidence that a defendant had a duty to preserve." *See id.* Such evidence must also be relevant to, e.g. support claims or defenses in litigation and the spoliation must result in prejudice to the non-spoliating party. *See Goodman v. Praxair Services, Inc.,* 632 F.Supp.2d. 494 (D.Md. 2009); *Rimkus Consumer Group, Inc., v. Cammarata,* 688 F.Supp.2d 598, 611-621 (S.D.Tex. 2010).

73. In lawsuits alleging "economic injury resulting from the destruction of evidence, a duty on behalf of the defendant arising from the relationship between the parties or some other special circumstances must exist in order for the cause of action to survive." *Holmes*, 710 A.2d at 849. A party "cannot establish detrimental reliance without first requesting preservation of the evidence." *Lewis v. J.C. Penney*, 12 F.Supp.2d at 1086.

74. The elements of the tort of *intentional* spoliation[8] are (a) the existence of pending or probable litigation involving the plaintiff; (b) defendant's knowledge that litigation is likely or does exist; (c) intentional acts of spoliation by the defendant that were designed to disrupt a plaintiff's ability to present his case; (d) actual disruption of plaintiff's case; and (e) damages that are proximately caused by defendant's conduct.

---

[8] One criminal code equivalent of the tort of spoliation is found in 18 U.S.C. § 1519 (2014), respecting destruction, alteration, or falsification of records in federal investigations and bankruptcy, which provides that it is unlawful to knowingly alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry "in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States...."

75.     The claims in the two (2) FINRA disciplinary actions Mr. North faces relate to his work at Southridge and Ocean Cross during the Relevant Period and are exclusively derived from ESI that should have been preserved as an unalterable, non-rewriteable and non-erasable record and retained in a reasonably and reliably accessible, searchable database maintained by Smarsh.

76.     Mr. Pompeo faces litigation from private parties with claims related to his registration at Southridge and Ocean Cross in which evidence of electronic communications will likely be tendered by third parties.

77.     Smarsh is a vendor of electronic communications preservation and related record keeping services that Messrs. North and Pompeo must obtain for regulatory compliance; the services provided by Smarsh to the Southridge and Ocean Cross firms were intended to benefit and were relied upon by all persons registered with the firm, including Messrs. North and Pompeo, to satisfy their duty to preserve all individual and firm electronic communications in a permanent unalterable, non-rewriteable and non-erasable format in a database that is also searchable for compliance purposes.

78.      By the nature of its business and practice of providing services to clients in "litigious and regulated industries", and because Mr. North requested that Smarsh deliver copies of ESI directly to FINRA, Smarsh knew and had a reason to know that its preservation of Plaintiffs' electronic communications were for compliance purposes, that an official investigation had commenced, that any and all such files of ESI were likely to be used in litigation of disciplinary actions by FINRA or SEC, and or in private causes of actions by individual clients or customers of the firms or individual registered representatives and,

therefore, a breach of the duty to use ordinary care to preserve the electronic communications would cause foreseeable harm.

79.     Unknown to the Southridge and Ocean Cross firms and to Messrs. North and Pompeo, and in an extreme departure from any standard of ordinary care and contrary to its duties to set up protocols by which the Southridge and Ocean Cross internal and external electronic communications would be preserved as a permanent, unalterable, non-rewriteable and non-erasable record, Smarsh remotely set up protocols and processes that pervasively degraded and stripped the ESI of encryption and security, permanently altering and leaving all such electronic communications vulnerable to a wide range of spoliation that is evident in all of the data.

80.     Smarsh breached its duties to Messrs. North and Pompeo by improper processing of electronic communications and intentional and unnecessary conversion from native to other formats, which failure of due care caused pervasive spoliation to all ESI and thereby foreseeably and completely deprived Messrs. North and Pompeo of any and all reliable records and disrupted their abilities to present any defenses in regulatory and third party actions and to pursue claims against those who are responsible for or contributed to the spoliation.

81.     Mr. North is being deprived of defenses in disciplinary actions against him because the ESI and email database in which he conducted compliance reviews were completely spoliated and rendered unreliable for any purpose.

82.     Mr. Pompeo was foreseeably deprived of defenses in a disciplinary action against him because spoliated email evidence used against him could not be explained or refuted; he suffered suspension and a fine.

83.     Mr. North contends it was foreseeable that he would incur legal costs, attorneys fees and other costs associated with discovering the nature, extent and causes of the spoliation and would suffer loss of income while being wrongfully subjected to disciplinary proceedings based upon the spoliated evidence: Mr. North's annual loss or reduction of wages for the years 2013 and 2014 was eighty-five thousand dollars ($85,00) and commencing in 2015 is a reduction of ninety-two thousand dollars ($92,000); when considering that he has a remaining eighteen (18) years of potential gainful employment, his present and future economic loss of income amounts to one million eight hundred twenty-six thousand dollars ($1,826,000).

84.     Mr. Pompeo contends that it was foreseeable he would incur legal costs, attorneys fees and costs associated with discovering the nature, extent and causes of the spoliation to be proven at trial, that he would suffer loss of employment or income after being subject to disciplinary proceedings based upon wrongfully on the spoliated evidence: Mr. Pompeo's average annual loss of wages is seventy-five thousand dollars ($75,000), which when considering that he has a remaining fifteen (15) years of gainful employment, his economic loss of income amounts to  one million one hundred twenty-five thousand dollars ($1,125,000).

85.     Messrs. North and Pompeo contend that the existence of ESI purporting to be email in multiple formats not native to the systems from which the ESI was obtained, as well as "missing" or "lost" files, demonstrates that Smarsh's conduct was intentional and therefore, each is entitled to punitive damages using a reasonable multiplier applied to the loss of wages and other damages, in amounts to be proven at trial.

## COUNT II – SPOLIATION OF ELECTRONICALLY STORED INFORMATION BY SMARSH
### (Spoliation by Gross Negligence)

86.     Plaintiffs North and Pompeo incorporate by reference the allegations contained in paragraphs 1 through 85.

87.      Messrs. North and Pompeo allege that if Smarsh did not act to intentionally spoliate the ESI, then its actions are the result of gross negligence due to an extreme departure from the standards of ordinary care in preserving ESI.

88.     Messrs. North and Pompeo suffered lost employment and lost wages due to Smarsh's gross negligence, and further incurred attorney's fees and costs associated with identifying the causes and extent of spoliation to the ESI.

89.     Messrs. North and Pompeo contend that the existence of electronic communications in multiple formats not native to the systems from which the ESI was obtained, changes to formatting, content, recipients and recipient addresses, and the number of "missing" or "lost" files demonstrates that Smarsh's conduct was due to an extreme departure from ordinary care and was grossly negligent; therefore, each is entitled to punitive damages using a reasonable multiplier applied to their anticipated loss of present and future income and other damages, in amounts to be proven at trial.

## COUNT III – SPOLIATION OF ELECTRONICALLY STORED INFORMATION BY SMARSH AND ENFORCEMENT
### (Negligent Spoliation)

90.     Plaintiffs North and Pompeo incorporate by reference the allegations contained in paragraphs 1 – 89.

91.     Messrs. North and Pompeo allege that if Smarsh did not act with intent or that its conduct was not the result of gross negligence, then Smarsh employees were negligent,

breaching the duty to use ordinary care in setting up the protocols for preserving and copying and compliance reviewing of the Southridge and Ocean Cross internal and external electronic communications, that such breaches of duty were the proximate cause of spoliation to the ESI, that the foreseeable harm due to the spoliation resulted in unwarranted disciplinary actions against Plaintiffs, the failure of evidence to defend against such actions, damage to their reputations, loss or reduction of employment and income, and caused them to incur attorneys fees, court costs, and the costs associated with proving the spoliation, in amounts to be proven at trial.

92.     Enforcement also had a duty to avoid spoliation to ESI, however, by and through its agents and employees, FINRA negligently contributed to the spoliation during the examination and investigations of Southridge and Ocean Cross by requiring that electronic communications be converted and delivered in .pst format, non-native to Bloomberg communications and certain other email programs.

93.     Enforcement's instructions to convert ESI to a certain format breached the duty to deliver ESI in native format as to substantial portions of ESI, e.g. Bloomberg messaging, were a proximate and contributing cause of spoliation to the ESI, resulted in the foreseeable harm of unwarranted disciplinary actions against Plaintiffs, the failure of evidence to defend against such actions, damage to their reputations, loss or reduction of employment and income, and caused them to incur attorneys fees, court costs, and the costs associated with proving the spoliation, all in amounts to be proven at trial.

## COUNT IV – INJUNCTIVE RELIEF
## AS TO SMARSH AND ENFORCEMENT

94.     Messrs. North and Pompeo incorporate by reference the allegations contained in paragraphs 1 – 93.

95.     Messrs. North and Pompeo seek permanent injunctive relief against Smarsh precluding it from further actions that spoliate any and all ESI derived during the Relevant Period and from delivering spoliated ESI to FINRA or any third party.

96.     Messrs. North and Pompeo also seek permanent injunctive relief against FINRA precluding its use of spoliated ESI derived during the Relevant Period in any present or future proceedings against either Mr. North or Mr. Pompeo.

97.     In seeking injunctive relief, the moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunctive relief were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C.Cir. 2006); *Hall v. Johnson,* 599 F.Supp.2d 1, 6 n. 2 (D.D.C.2009) ("[t]he same standard applies to both temporary restraining orders and to preliminary injunctions"). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297. "The four factors have typically been evaluated on a 'sliding scale.'" *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291 (D.C.Cir. 2009). Under this sliding scale, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92.

98.     In this case, a computer technician, a consultant from Navigant, and Berryhill independently concluded that pervasive spoliation to ESI allegedly preserved by Smarsh occurred; at no time did Plaintiffs handle or process the ESI, therefore, Messrs. North and Pompeo are likely to prevail on the merits of their claim for injunctive relief.

99.     Both Messrs. North and Pompeo suffered irreparable harm when each experienced loss of employment, reduction in wages, and or loss of professional reputation due to unwarranted and unfounded claims made by FINRA against each, which claims are based substantially if not exclusively on ESI spoliated due to Smarsh's intentional or grossly negligent or other negligent handling.

100.    Irreparable harm in the form of unwarranted legal actions will continue to occur as long as FINRA or any other third party or entity can use or make available for use in Enforcement and other legal proceedings any ESI processed and spoliated by Smarsh during the Relevant Period due to Smarsh's intentional or grossly negligent or negligent mishandling.

101.    Neither FINRA nor Smarsh will suffer harm if injunctive relief is granted, because it is unlawful to knowingly use corrupted evidence in federal proceedings.

102.    The public interest is furthered by injunctive relief that will prohibit FINRA's use of spoliated ESI in federal proceedings against Messrs. North and Pompeo because it is unlawful to knowingly use false or corrupted evidence in federal proceedings; the public interest is better served by preventing and providing sufficient sanctions for the use of spoliated, false or corrupted evidence in federal proceedings.

103.    Messrs. North and Pompeo have no adequate remedy at law (a) as long as Smarsh uses protocols and processes that spoliate electronic communications, denies that spoliation occurred, and is willing to testify falsely about its business and performance of its duties; and (b) as long as FINRA contends that spoliation of ESI is irrelevant to lawful defenses to claims and proceedings predominantly, if not entirely, dependent upon spoliated ESI, while using spoliated evidence in proceedings to advance monetary and non-monetary sanctions that cause permanent and irreversible harm.

THEREFORE, Plaintiffs pray for:

a.      Judgment against Smarsh and findings that Smarsh agents and or employees intentionally or with gross neglect spoliated the electronic files used in federal proceedings;

b.      Judgment against Smarsh and findings that Smarsh agents and or employees negligently spoliated the electronic files used in federal proceedings;

c.      Judgment against FINRA and findings that FINRA agents and or employees negligently contributed to the spoliation of the electronic files used in federal proceedings;

d.      Judgment against one or both defendants to each for present and future lost wages, in the amounts of one million eight hundred twenty-six thousand dollars ($1,826,000) for Mr. North and one million one hundred twenty-five thousand dollars ($1,125,000) for Mr. Pompeo, plus costs and allowable attorneys fees;

e.       Judgment against Smarsh for punitive damages based upon economic and other applicable damages due to Smarsh's intentional conduct or gross neglect in processing ESI during the Relevant Period;

f.      For permanent injunction, enjoining Defendant Smarsh, and its agents, servants, and employees, and all persons acting under, in concert with, or for them from actions and methods that spoliated the ESI described herein, and enjoining delivery of the spoliated records described herein to others for use in pending and any future litigation involving Plaintiffs;

g.       For permanent injunction, enjoining Defendant FINRA Enforcement, and its agents, servants, and employees, and all persons acting under, in concert with, or for them from using the ESI and records described herein and spoliated by Smarsh in pending and any future Enforcement or other FINRA related litigation involving Plaintiffs; and

h.      Other relief as may be appropriate under the circumstances.

Respectfully submitted,

**THADDEUS J. NORTH and**
**MARK P. POMPEO**

By: /ss/ Constance J. Miller
Constance J. Miller, DC# 499445
2010 Corporate Ridge Drive, Suite 700
McLean, VA 22102
Phone: 703-883-9360
Cjmiller1951@me.com

## **JURY DEMAND**

Plaintiffs demand trial by jury as to all issues that are triable.

## APPENDIX OF ACRONYMS / INITIALS

The following acronyms are used in the forgoing pleading:

LK = Leslie King
TC = Todd Cowle
AH = Aubrey Hurse

## EXHIBITS

| | |
|---|---|
| Exhibit 1 | Excerpts from William E. Schloth On the Record Interview ("OTR") (In the Matter of Southridge) dated February 9, 2012 |
| Exhibit 2 | Excerpts from LK OTR (In the Matter of Southridge) dated September 13, 2011 |
| Exhibit 3 | Smarsh Representative Letter dated August 19, 2014 |
| Exhibit 4 | Excerpts from Hear'g Trans. (In the Matter of Ocean Cross) dated November 5, 2014 |
| Exhibit 5 | Excerpts from William E. Schloth OTR (In the Matter of Ocean Cross) dated April 23, 2012 |
| Exhibit 6 | Web.com Account Summary |
| Exhibit 7 | Excerpt from Hear'g Trans. (In the Matter of Ocean Cross) dated November 25, 2014 |
| Exhibit 8 | Declaration of Jon Berryhill dated March 2, 2015 |